J-S03020-25
J-S03021-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.M.E.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1155 WDA 2024 |

Appeal from the Decree Entered August 29, 2024
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000040-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: L.M.E.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.E.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1156 WDA 2024 |

Appeal from the Decree Entered August 29, 2024
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000040-2024

BEFORE:  KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY SULLIVAN, J.:            **FILED: MARCH 17, 2025**

L.M. ("Father") and K.E.L. ("Mother") (collectively, "Parents") appeal

from the August 29, 2024 decree involuntarily terminating their parental

J-S03020-25
J-S03021-25

rights to their biological daughter, L.M.E.M. ("Child"), born in January 2023.[1]

After review, we affirm.

The Orphans' Court summarized the relevant factual history of this matter, as follows:

> The family has been known to [the Allegheny County Office of Children, Youth and Families ("CYF" or "the Agency")] since [July] 2021[,] because of the abuse of [Child's] sibling. The sibling is a boy born to the same two parents. When the sibling was one week old, he was crying in the night, and Father went into the room and later told the police he had been in a bad mood and had "squeezed" the baby.
>
> Mother . . . later told police that **the squeezing lasted for several minutes and was accompanied by cracking sounds in the infant's body**. Mother initially attempted to call for medical help, but Father deleted her attempted 911 call and shut off her phone. The next day, Mother noticed that the infant's back was purple. Father told Mother that he believed the infant would get better on his own, but the baby's body made worsening[,] popping sounds. It took [Parents] a full week to bring the baby to the hospital. Mother told CYF that she had been afraid of how Father would react if she tried to take [Child's sibling] sooner. At the hospital, the infant, then 13 days old, was found to have multiple rib and other fractures, some in early healing stages and some not, as well as deep circular abrasions on his face, all wounds that would cause substantial pain. The injuries were ascribed to abuse, and the infant was admitted to the hospital. Although the damage to the infant was nearly fatal, he survived.

_____

[1] We have consolidated these appeals *sua sponte* for ease of disposition. The appeals are from the same court order and involve a similar factual and procedural history. Additionally, the Orphans' Court addressed both appeals in a single opinion. **See** Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").

- 2 -

In February [] 2022, Mother pleaded guilty to endangering the welfare of children. Mother served a term of probation. In March [] 2022, Father pleaded *nolo contendere* to felony [] aggravated assault of a child under the age of 6.

[Ultimately, Parents] consented to the adoption of [Child's] sibling, and [i]n March [] 2023, their consents were confirmed. The [sibling] now resides with Mother's great-grandparents.

* * * * *

Within a month of [Parents] entering their criminal pleas, [they] conceived again, and [in January 2023], Child . . . was born. CYF obtained an emergency protective custody order for her two days later [due to ongoing Agency involvement and Parents' failure to reach their goals]. [Child] was placed with her maternal great-grandparents [along] with her sibling [where she has remained throughout these proceedings].

On February 27, 2023, [Child] was adjudicated dependent as to Mother. Mother's goals were to complete supervised visits, participate in mental health treatment through Turtle Creek, and undergo intimate partner violence ("IPV") treatment through the Women's Center and Shelter. Moreover, she was to work on parenting [skills] and connecting with the Office of [Intellectual] Disability ("OID") for evaluation and potential services, if recommended.[2]

On March 13, 2023, Child also was adjudicated dependent as to Father. The court found aggravated circumstances, given Father's recent history of severe abuse of [Child's] infant sibling.[3]

---

[2] Mother was additionally required to obtain stable housing. **See** N.T., 8/8/24, at 44.

[3] Despite a finding of aggravated circumstances, the Orphans' Court required the Agency to continue to make reasonable efforts to reunite Child with Parents.

Father's goals included visitation with parenting assistance with the help of Family Resources,[4] participation in mental health care through Turtle Creek, obtaining stable housing, complying with probation, and addressing IPV through the Women's Center and Shelter.

Orphans' Court Opinion, 10/17/24, at 2-3 (citations omitted, capitalization standardized; emphasis added).

Throughout the ensuing dependency proceedings, the court held regular permanency review hearings and maintained Child's commitment and placement. **See** CYF Exhibit 1.

On April 24, 2024, the Agency filed a petition for the involuntary termination of Parents' parental rights pursuant to 23 Pa.C.S.A. § 2511(a), (2), (5), (8), (9), and (b). The Orphans' Court conducted an evidentiary hearing on the Agency's petition, at which Parents were each present and represented by separate counsel. Child, then eighteen months old, had been in foster care for her entire life; her court-appointed guardian *ad litem* from KidsVoice represented her at the hearing.[5]

---

[4] Family Resources is a child abuse prevention agency. **See** N.T., 8/8/24, at 6. Their prevention services program includes "home visiting, parent education and parenting classes." CYF Exhibit 7.

[5] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if [trial] courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a). **In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020). Further, if the appointed legal interest counsel also serves as GAL, "appellate courts should review *sua sponte* whether the
*(Footnote Continued Next Page)*

- 4 -

Mary Safran ("Ms. Safran"), of Family Resources, who provides parenting and support assistance, testified that Mother began supervised visitation in June 2023, which included parent coaching. *See* N.T., 8/8/24, at 8; *see also* CYF Exhibit 7. These visitations were intended to occur jointly. However, as the testimony of Chelsea Croner ("Ms. Croner"), a CYF caseworker, established, Mother's and Father's visits were separated and Father was not permitted at the Agency after an incident on July 4, 2023, when Father punched or poked Mother in the eye. *See* N.T., 8/8/24, at 60, 114, 188-189, 227; *see also* CYF Exhibit 1; *see also* Joint Exhibit 1 at ¶ 12. Ms. Croner testified Mother later characterized the incident as a "misunderstanding." *See* N.T., 8/8/24, at 47.

Ms. Safran described an instance of Father's aggression in August 2023, when he appeared at the Agency during Mother's visitation and was "aggressive" and "intimidating" toward a staff member in Child's presence when reminded that he was not permitted to be present. *See id*. at 11, 13-14, 17, 27-28. Ms. Croner testified Mother said Father, "[W]on't listen to me. I tell him that I'm going to visit alone and he told [sic] me that he was going

---

[Orphans'] [C]ourt made a determination" that the child's legal interests and best interests "did not conflict." *Id*.

Here, in compliance with Section 2313(a), the Orphans' Court appointed the Child's guardian *ad litem* from the dependency proceedings, KidsVoice, as her legal interest counsel and determined that "no conflict exists that would prevent KidsVoice from accepting this appointment." Order, 5/7/24.

to come to the visit anyway." ***See id***. at 51-53, 99-100, 187-188. In Ms. Safran's words, "Everybody was upset. [Child] was upset. She was a baby. The driver was crying. It was just a big[,] hot mess." ***See id***. at 14, 17.

Ms. Croner testified that in September 2023, Father, again in the presence of Child, was aggressive and cursed at Mother while on speakerphone during Mother's separate visit. ***See id.*** at 51-52, 81-82; ***see also*** CYF Exhibit 6. Ms. Croner testified that after the call, Mother told the Agency that they were being "too hard" on Father. ***Id***. at 51; ***see also*** CYF Exhibit 6.

Ms. Safran testified that in December 2023, Mother texted her that she had argued with Father and "was hiding and locked in her bedroom because [Father] was destroying her house[,] and she was very scared and thought that [he] would hurt her." N.T., 8/8/24, at 11, 48, 87-88. Ms. Safran remained in communication with Mother until the police arrived. ***See id***. at 11, 32. Ms. Safran testified she and other service providers advised Mother to get a protection from abuse order ("PFA") against Father, but Mother made various excuses and never did so. Ms. Croner further testified Mother was not consistent in attending individual and group intimate violence sessions after Child's birth and did not avail herself of a non-offenders' program, or of OID treatment. ***See id***. at 12, 45-46, 48-50, 55-57, 72, 85-87. Ms. Safran testified Mother downplayed the seriousness of the December 2023 incident, asserted Child's sibling, who had suffered severe injuries from Father's

violence, was "fine," and stated she and Father were "getting along very well." *See id*. at 12, 14, 16, 48-49.[6]

Mother was eventually granted partially unsupervised visits with Child which she began exercising in May 2024. *See id*. at 19, 28-29, 60, 87, 147. Father did not progress to unsupervised visitation. *See id*. at 61. The court ultimately reinstated Parents' joint visitation in July 2024. *See id*. at 6, 8, 10, 60-61; *see also* CYF Exhibit 1. Although Father completed two IPV-related programs, Ms. Croner testified he failed to comply with additional, court-ordered IPV treatment. *See* N.T., 8/8/24, at 61-62, 94-96. The hearing testimony also established Father failed to secure independent housing and has been living with his aunt for an extended period of time. *See id*. at 65-66, 120, 186.

Ms. Croner testified the Agency was seeking termination due to Parents' failure to make progress in meeting their goals over the course of three years, dating to the time of Child's sibling's birth. *See id*. at 68. She cited continuing issues with domestic violence, including Father's destructive behavior in December 2023, Mother's and Father's inconsistent attendance at sessions at

---

[6] However, Ms. Croner testified Mother changed her shifts at Kentucky Fried Chicken where Father also worked because he was harassing other staff. *See* N.T., 8//8/24, 55.

the Women's Center and Shelter,[7] in addition to concerns about Parents' plan to live together, Parents' mental health, Father's failure to attend scheduled visits with Child, Father's lack of housing stability, and the facts Parents had only recently progressed to unsupervised visits and Child had been in care for eighteen months, essentially her whole life. *See id*. at 50, 68-69, 73, 84-87, 95-96, 99. Ms. Croner also testified Mother has failed to attend Child's medical appointments. *See id*. at 71.[8]

Dr. Beth Bliss, a licensed psychologist and an expert in child psychology testified she conducted individual, and four interactional, evaluations of Parents from 2021 through 2024. *See id*. at 110-11. Dr. Bliss testified Parents have displayed a consistent pattern of failing to acknowledge, or address, the serious issues of partner violence in their relationship. Significantly, neither Mother nor Father reported Father's December 2023 destructive outburst to Dr. Bliss. *See id.* at 113-114, 143, 218; *see also* CYF Exhibit 5.[9] When she learned for the first time at the hearing about that outburst, Dr. Bliss testified it raised concerns about whether Father had

_____

[7] Ms. Croner testified Mother attended two or three sessions in the six to eight months prior to the hearing, and she and Father were consistent "no-shows." *See id*. at 86-87.

[8] Ms. Safran did testify that in the two (supervised) visits Parents had with Child in the two weeks preceding the hearing, they were very attentive and took good care of Child. *See* N.T., 8/8/24, 10, 32.

[9] When questioned at the hearing, Mother testified the incident had "slipped . . . [her] mind" when speaking to Dr. Bliss. *See id*. at 217-218.

actually progressed in his therapy, and his continued unwillingness to take responsibility for the severity of his actions. *See* N.T., 8/8/24, at 115-18, 123, 141-42, 164-67, 171-72.[10]

Dr. Bliss diagnosed Mother as having a mild intellectual disability that increased the risk she could not protect Child, a concern that was ongoing at the time of the hearing. *See* N.T., 8/8/24, at 123-24, 130. 165-66; *see also* CYF Exhibit 5.[11] Dr. Bliss testified Mother had made good progress but she still had concerns about both the safety of Mother and Child, and whether Mother and Father could successfully co-parent Child. *See id*. at 151, 171-72. Dr. Bliss diagnosed Father as having unspecified personality disorder with anti-social traits and borderline intellectual functioning, which is difficult to treat. *See id*. at 111-112, 121; *see also* CYF Exhibit 5. Additionally, the hearing testimony showed Father attended one therapy session per month between 2022 and 2024, rather than once per week as she had recommended. *See id*. at 64-65, 92-93, 98-99, 101-103, 121-22, 158, 161.

Ms. Croner testified Child is "definitely very well-bonded" with both of her great-grandparents, with whom she lives and who meet all of her needs. *See id*. at 68. Further, Dr. Bliss, who also completed interactional evaluations

_____

[10] Ms. Safran also testified Mother was in denial when she discussed the serious injuries Father inflicted on Child's sibling. *See* N.T., 8/8/24, 16.

[11] In her most recent evaluation, Dr. Bliss found improvement in Mother's and Father's parenting. *See id*. at 132-33.

of Child and her maternal great-grandparents, observed a "bond and attachment" and noted "positive and appropriate" interaction. *Id*. at 134. She testified Child "[s]ought out sharing experiences with them. She used them as a secure base to explore the room with me as a stranger in the room. She was happy and engaged with them throughout. I didn't have any concerns with their interactions." *Id*. at 134-135; *see also* CYF Exhibit 5. Dr. Bliss opined that the maternal great-grandparents were Child's "psychological parents." CYF Exhibit 5.

Mother testified she participated in parenting classes, but admitted she needs reminders about when Child's doctors' appointments and shots are to be scheduled. *See id*. at 207-09. She also testified she did not know Father's conduct in December 2023 would be classifiable as domestic violence. *See id*. at 217.

Father testified the July 2023 incident involved only his playfully poking Mother, *see id*. at 189, he stated Mother has not been truthful about the event, *see id*. at 198, and he asserted he has matured since 2021, *see id*. at 196.

Father also presented the testimony of Samantha Speir ("Ms. Speir"), his current mental health counselor who saw him bi-weekly for the prior two years that he had made progress in the prior five months. *See id*. at 175-77. Ms. Spier was, however, unaware of the severity of the injuries Father had inflicted on sibling, and Father had not shared Dr. Bliss's evaluations with her,

or the recommendation he receive therapy once per week. *See id*. at 181-84.[12]

By decree dated August 29, 2024, the Orphans' Court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), (9), and (b). The court additionally terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b), and changed Child's permanency goal to adoption. Parents separately filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The Orphans' Court filed a joint Rule 1925(a) opinion.

On appeal, Parents each challenge the sufficiency of the evidence pursuant to Section 2511(a) and (b). *See* Father's Brief at 3; Mother's Brief at 3.

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must

---

[12] We note with disapproval the exhibits from this proceeding were not originally included with the certified record and were only obtained as a supplement by request of this Court. We remind counsel that appellants bear "the responsibility to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Wint*, 730 A.2d 965, 967 (Pa. Super. 1999) (citations and internal quotation marks omitted); *see also* Pa.R.A.P. 1921 Note (stating that "[u]ltimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials") (citation omitted).

J-S03020-25
J-S03021-25

accept the [Orphans' Court's] findings of fact and credibility determinations if they are supported by the record. Where the [Orphans' Court's] factual findings are supported by the evidence, an appellate court may not disturb the [Orphans' Court's] ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to [Orphans' Courts], who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, [the Orphans' Court] must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted; capitalization standardized).

Section 2511 of the Adoption Act ("the Act") governs the involuntary termination of parental rights. ***See*** 23 Pa.C.S.A. § 2511. Under the Act, the court must first determine whether the parent's conduct warrants termination under one of the grounds set forth at section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. ***See In re T.S.M.***,

71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both section 2511(a) and (b) by clear and convincing evidence. **See In re Adoption of C.M.**, 255 A.3d 343, 359 (Pa. 2021).

This Court need only agree with any one subsection of section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Thus, we will examine Mother's arguments pursuant to section 2511(a)(2), Father's arguments pursuant to section 2511(a)(9), and Parents' arguments pursuant to section 2511(b). Those statutory provisions are as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> *****
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> *****
>
> (9) The parent has been convicted of one of the following in which the victim was a child of the parent:
>
> *****
>
> > (ii) a felony under 18 Pa.C.S.[A.] § 2702 (relating to aggravated assault);
>
> *****
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the

- 13 -

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (9), (b).

We will address Parents' subsection (a) claims in turn, beginning with Father's.

Section 2511(a)(9) Grounds Regarding Father

Father asserts 23 Pa.C.S.A. § 2311(a)(9) permits, but does not require, termination where a parent has been convicted of a felony such as his aggravated assault of his newborn son and further argues he has made significant progress in his goals. *See* Father's Brief at 21-23.

The Orphans' Court declared Father's conduct of squeezing Child's then one-week-old sibling for minutes, despite cracking sounds in the infant's body, "depraved." It also noted that Father had kept Mother from getting medical help for the child for one week. Orphans' Court Opinion, 10/17/24, at 17. The court further found that Father's explanations of his aggressive conduct in 2023 were "not credible," nor were his professions that he no longer becomes angry or frustrated. *Id*. It concluded Father had never taken full responsibility for the severity of Child's sibling's injuries. *See id*. at 18.

- 14 -

The Orphans' Court did not commit legal error when it found clear and convincing evidence supporting the application of Section 2511(a)(9). As the court explained at the conclusion of testimony at the termination hearing, Father's angry outbursts in July and December 2023, evidenced Parents still have issues of violence. *See* N.T., 8/8/24, at 269, 274. The court also expressed concern Father failed to continue treatment after his twenty-four sessions with a men's group, although he merited praise for participating in other mental health treatment. *See id*. at 276-77. The court also specifically referred to Dr. Bliss's diagnoses of Father's mental health concerns as a threat to Child's safety. *See id*. at 278-79. Thus, the court did not rely solely on Father's felony aggravated assault conviction as the basis for termination but considered the relevant factors concerning the risk he posed to Child. Father's claims merits no relief.

Section 2511(a)(2) Grounds Regarding Mother

Section 2511(a)(2) emphasizes the child's present and future needs, not the parent's refusal to perform their duties and thus "should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties. . . . ***This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.***" ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010) (emphasis in original, internal citation omitted). Section 2511(a)(2) grounds are not limited to affirmative misconduct; they may also include acts of refusal

and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by Interest of K.T.*, 296 A.3d 1085, 1110 n.23 (Pa. 2023). We have long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021).

Mother asserts that the evidence was insufficient to support a continued lack of protective capacity given her advancements in parenting skills, mental health, and IPV. She argues that the evidence did not support the concern she would be unable to protect Child from Father, and that she has made major improvements in her parenting and mental health. *See* Mother's Brief at 17-18.

The Orphans' Court found that Mother continued to exhibit a lack of protective capacity, failed to complete several of her prescribed permanency goals, and could not or would not remedy any lack of parental care. Specifically, the Orphans' Court cited Mother's consistent downplaying of the seriousness of Father's repeat outbursts and aggressive actions in 2023, her offering excuses for that conduct, and her withholding information from Dr. Bliss, offering the non-credible excuse Father's December 2023 destructive acts "slipped her mind." *See* Orphans' Court Opinion, 10/17/24, at 20. The trial court also expressed concern for Child's safety because Mother was vague with Ms. Safran about Father's aggravated assault of Child's sibling that

brought the sibling into care. *See id*. at 20. The court acknowledged Mother had made progress in coached parenting, but expressed concern that Mother defers to Father and "has an unrealistic view of his parenting capacity." *See id*. at 21. The court explained the risk to Child presented by Mother's inability to see Father's character accurately:

> [C]hild's safety is of overwhelming importance, and the evidence was abundant that Mother will not or cannot resist elevating her relationship with Father over that safety, blinding herself to his aggression and remaining naïve at best to his ability to gain better control and parenting abilities after nearly killing their first infant.

*See id*. at 21. Finally, the court noted Mother did not follow up on non-offenders' treatment and was not consistent in attending her IPV program. *See id*. at 21.

The Orphans' Court correctly found the Agency presented clear and convincing evidence supporting the application of section 2511(a)(2). The combination of Mother's intellectual limitations, her continuing inability to assess, and respond to, the risk Father presented to her and Child, inconsistent attendance for IPV counseling, failure to avail herself of IOD services, and Dr. Bliss's assessment she was not ready to care for the Child, *see* N.T., 8/8/25, at 135-136, established Mother's repeated and continued incapacity, abuse, neglect or refusal which has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See A.H.*, 247 A.3d at 443. Moreover, that evidence established Mother cannot or will not remedy those deficiencies. *See id.* Though

commendable, Mother's progress over three years was not sufficient to permit her to care for her nearly-two-year-old Child, who had spent her entire life in care. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006). Mother's claim does not merit relief.

Section 2511(b) Grounds Regarding Parents

Section 2511(b) requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child" when considering whether to involuntarily terminate parental rights. 23 Pa.C.S.A. § 2511(b); **see also T.S.M.**, 71 A.3d at 267.

We note that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis" focusing on the specific needs of the child under consideration. **K.T.**, 296 A.3d at 1105-1106. This inquiry must include consideration of the bond between the parent and the child. **See In re E.M.**, 620 A.2d 481, 485 (Pa. 1993). Not all bonds are healthy or worthy of consideration; "only a necessary and beneficial" parental bond should be maintained. **K.T.**, 296 A.3d at 1009; **In re K.K.S.-R.**, 958 A.2d 529, 535 (Pa. Super. 2008) (recognizing that the mere existence of a bond is not proof of a beneficial bond, and that "[e]ven

- 18 -

the most abused of children will often harbor some positive emotion towards the abusive parent"). A bond is "necessary and beneficial" if its severance would cause extreme emotional consequences or significant, irreparable harm. *K.T.*, 296 at 1109-10. Further, an Orphans' Court has the discretion to prioritize the safety and security of children over any parental bond. *See M.E.*, 283 A.3d at 839. Courts should also consider whether the Child is in a pre-adoptive home and has a bond with foster parents. *K.T.*, 296 A.3d at 1106. A child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." *Id*.

Parents challenge the Orphans' Court's finding that termination of their parental rights served Child's developmental, physical and emotional needs and welfare of the child pursuant to section 2511(b). They each contend that they enjoy a positive or necessary and beneficial bond with Child, which termination would negatively impact. *See* Father's Brief at 24-25; Mother's Brief at 22.

In determining that termination additionally served Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b), the Orphans' Court found neither Mother nor Father could meet Child's needs for security and stability, and although Child had a growing bond with Mother, Child's "truest" bonds were with foster parents, who were her great-grandparents, with whom she had lived virtually her entire life, and who provided for all of her needs. *See* Orphans' Court Opinion, 10/17/24, at 24.

It further found Father's "history of . . . violence and his continuing aggression" rendered him incapable of safeguarding Child, and Mother's minimization of Father's anger and aggression and inability to stand up to him rendered her unable to ensure Child's safety. *See id*. at 23.[13]  In further support of its finding, the court cited Father's difficulty understanding Child's developmental stage, the fact he never progressed to unsupervised visits, and Mother's unrealistic assertion she could protect Child's safety if they all lived together. *See id*.  The court concluded that "[f]orcing continued efforts at reunification [would] only create further instability by prolonging Child's uncertain living arrangements and magnifying attachments with [Parents] when they are far from achieving the ability to safely parent Child.  The weight of the evidence and factors to consider under Section 2511(b) tips greatly toward providing Child with permanence in her current home." *See id*. at 25.

We discern no abuse of discretion.  The record fully supports the Orphans' Court's finding that Child's developmental, physical and emotional needs and welfare favors termination pursuant to Section 2511(b).  Undoubtedly, Dr. Bliss perceived Parents had made "significant progress." *See* N.T., 8/8/24, at 151.  However, Dr. Bliss was concerned that IPV issues continued to exist between them, including Father's destructive violence in

---

[13] The court also noted Mother's failure to inform Dr. Bliss of Father's destructive behavior in December 2023. *See* Orphans' Court Opinion, 10/17/24, at 24.

December 2023, Mother had concealed from her and she first learned of at the hearing, and Mother's subservience to Father. All those facts led Dr. Bliss to the conclusion neither parent was ready to care for the Child.[14]

We discern no abuse of discretion with the Orphans' Court's finding that the termination of Parents' parental rights will serve the developmental, physical, and emotional needs and welfare of Child pursuant to section 2511(b). Upon review, the record substantiates that Child does not share a "necessary and beneficial" relationship with Parents and instead shares such a relationship with her maternal great-grandparents. **See K.T.**, 296 A.3d at 1113.

Based on the foregoing, we affirm the decree terminating Parents' parental rights.

Decree affirmed.

---

[14] To the extent that Parents emphasize Dr. Bliss's reference in her report to subsidized permanent legal custodianship ("SPLC")[14] as an option, **see** Father's Brief at 25; Mother's Brief at 22, the Agency never approved or pursued such an arrangement. Moreover, Dr. Bliss testified that the termination of Mother's parental rights would not cause Child to suffer "extreme emotional detriment," N.T., 8/8/24, at 139-140, Child's safety and security outweighed their growing bond, **see id**. at 137-138, and foster parents were Child's "psychological parents." CYF Exhibit 5. Further, as the Orphans' Court noted, Father had a lesser bond with Child.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/17/2025